JUSTICE NELSON,
dissenting.
¶102 I dissent from the Court’s decision on Issues Three, Four, and Five. I do so for the reasons articulated in my dissent in the companion *241 case, Kafka v. Montana Dept. of Fish, Wildlife and Parks, 2008 MT 460, ¶¶ 96-248, 348 Mont. 80, ¶¶ 96-248, 201 P.3d 8, ¶¶ 96-248 (Nelson, Rice, & Swandal, JJ., dissenting) (hereinafter, “Kafka Dissent”), and for the additional reasons set forth below. I do not express any views on the Court’s resolution of Issues One and Two.
I. INTRODUCTION
¶103 As it did in Kafka, the Court again holds that business owners in the alternative livestock industry are entitled to no compensation whatsoever for the outright destruction of their businesses by Initiative No. 143 (“Initiative” or “1-143”). The State encouraged people to embark on this “viable economic opportunity,” facilitated their investment of millions of dollars into such enterprises, and granted them a statutory right to perpetual renewal of their business licenses. Then, the State up and legislated the businesses out of existence. According to the Court, such action does not constitute a taking or damaging of property under Article II, Section 29 of the Montana Constitution.
¶104 In reaching this conclusion, and in spite of the plain language of Article II, Section 29, the Court makes the astounding pronouncement that Article II, Section 29 is little more than a constitutional redundancy-an empty provision guaranteeing nothing beyond what the federal courts deem compensable under the Fifth Amendment to the United States Constitution. This pronouncement finds no support in the text of Article II, Section 29, which is facially broader than the Fifth Amendment. It finds no support in the history of Article II, Section 29 and its predecessor, Article III, Section 14 of the 1889 Constitution, which were intended to provide greater protection than the Fifth Amendment against infringements on Montanans’ property rights. It finds no support in the prior decisions of this Court, which recognize independent protections of property under the Montana Constitution. And it is contrary to the Constitutional Convention delegates’ charge that this Court “revitalize” the civil rights of Montanans.
¶105 Rather, the Court’s decision is based on one single proposition: that the delegates to the 1889 and 1972 Constitutional Conventions and the voters who approved these Constitutions intended for the meaning of “taking” and “damaging” property to be frozen in time. Adopting an originalist interpretation of Article II, Section 29, the Court rejects the notion that the terms “taking” and “damaging” together were meant to provide a broader range of protection than *242 extant Fifth Amendment jurisprudence provides. Instead, the Court prefers to restrict Article II, Section 29 to only those situations which were not covered by the Fifth Amendment in the late nineteenth century: “determinable consequential damages” resulting from public works projects. I strenuously dissent from this emasculation of Article II, Section 29.
¶106 Both the Fifth Amendment and Article II, Section 29 require just compensation for the taking and damaging of property effected by 1-143. I comprehensively analyzed this issue under the Fifth Amendment in Kafka (see Kafka Dissent, ¶¶ 177-240); and since there are no material factual distinctions between Kafka and the present case, it is not necessary to repeat that analysis here. Rather, I focus in this Dissent primarily on Article II, Section 29 and explain why, contrary to the Court’s decision, this provision entitles the Buhmanns and the Wallaces (collectively, “the Ranchers”) to just compensation. First, however, I address several factual and legal issues argued by the Sportsmen, the State, and the Ranchers in this case. I addressed some of these issues in Kafka', accordingly, I simply reiterate the critical points here as foundation for the ensuing analysis.
II. PRELIMINARY FACTUAL AND LEGAL ISSUES A. The Sportsmen’s Explanation of 1-143
¶107 It has been a lawful “business or occupation” in this State since 1917 to acquire, breed, own, harvest, sell, and otherwise control privately owned game animals on an alternative livestock ranch.[1] This activity has been regulated, and the regulations have become more rigorous over the years. At the same time, however, the Legislature has enacted provisions designed specifically to protect the business owners’ interests-e.g., through statutory recognition of their alternative livestock as “private property” and their businesses as “viable economic opportunities,” and through the statutory guarantee that their alternative livestock ranch licenses would be renewed each year upon payment of the renewal fee and compliance with all recording and reporting requirements. See generally Kafka Dissent, ¶¶ 103-109.
¶108 1-143, which was passed on November 7, 2000, gutted the alternative livestock industry and rendered the regulatory scheme *243 pointless. The Sportsmen, who were “the principle forces behind the passage of 1-143,” sought to snuff out alternative livestock ranching without the public’s having to foot the bill. To that end, they “carefully crafted” a citizen initiative (1-143) to prohibit remuneration for shooting alternative livestock on alternative livestock ranches, thereby forcing all businesses in the industry to operate, essentially, without any income. See Kafka Dissent, ¶¶ 114-120. As counsel for the Sportsmen explained during oral argument:
There was a recognition by my clients that if they passed a statute that simply said, “Every game farm is done tomorrow,” that that would be a very difficult takings claim to defend against. And we didn’t want to have to go down that road. And so the statute was carefully crafted to address the problem in a way that was not offensive to taking but at the same time benefitted the wildlife and the wildlife management of this State.
The assertion that the Sportsmen’s transparent charade is “not offensive” to the guarantee of just compensation for a taking or damaging of private property is preposterous.
¶109 In any event, the Sportsmen did not detail their intentions to the voters. Rather, according to the Sportsmen, “[f]oremost among the issues presented to the voters in 1-143 were concerns about disease, loss of fair chase hunting ethics and European style privatization of wildlife.” In other words, the Sportsmen told the voters not that 1-143 had been “carefully crafted” to obliterate an entire industry-an industry that had been sanctioned, encouraged, and nurtured by the State for 83 years, no less-but that 1-143 was “aimed” at the alluring goal of “protecting Montana’s wildlife and hunting heritage from a variety of dangers posed by game farms.” An analysis of the Initiative, however, reveals that it did not actually address any of these dangers. As a matter of fact, the Sportsmen tacitly admit that 1-143 was a fraud on Montana voters.
¶110 For instance, regarding disease, the Sportsmen paint a grim picture. They state that “[cjontact between game farm animals and wildlife can result in disease and parasite transmission, with devastating impacts to native wildlife.” They complain that “[g]ame farm enclosures require only a single fence and do not prevent nose to nose contact between wild ungulates and game farm animals.” Plus, “[i]t is virtually impossible to keep game farm animals from coming into contact with wild animals, as escaped animals are a fact of life for game farm owners.” Moreover, aside from direct contact, “[s]ome diseases are transmitted by intermediate hosts, making any form of *244 enclosure ineffective for disease prevention.”
¶111 The Sportsmen argued these concerns to the voters. Indeed, the Sportsmen cite the 2000 Voter Information Pamphlet for the proposition that “[o]ne of I-143’s primary purposes was to minimize the CWD threat to Montana’s wildlife.” (“CWD” is short for “chronic wasting disease.”) Accordingly, given these concerns, one would expect 1-143 to target the problems related to diseases, perhaps through more stringent fencing and enclosure requirements, additional testing requirements, or even an outright seizure of all alternative livestock along with a prohibition on private ownership of alternative livestock. However, 1-143 did none of these things. As the Sportsmen acknowledge, “[g]ame farms licensed prior to November 2000, are still legal in Montana, even after 1-143,” and “[g]ame farm operators are free to ‘acquire, breed, grow, pursue, handle, sell or dispose’ of game farm animals.” 1-143 imposed no new fencing or testing requirements. It does not prohibit people from owning alternative livestock on alternative livestock ranches, and it does not address the problem of transmission of diseases through intermediate hosts or inadequate fencing. In spite of the dire threat posed by diseases, the Sportsmen’s initiative contains nothing addressing that issue.
¶112 As for hunting ethics, the Sportsmen state that “Montana has a proud heritage of ethical hunting and the protection of wildlife, and 1-143 was intended to protect the state’s interest in those traditions.” They assert that “[i]n addition to the enormous economic benefits of traditional big game hunting, Montanans hold dear their hunting tradition as an important component of their western heritage,” particularly “the concept of fair chase hunting.” The Sportsmen explain that they and other citizens “opposed the ‘penned hunts’ offered by many game farms” because “[s]hooting an animal in an enclosed facility is repugnant to these ethical hunting traditions.” Again, citing the 2000 Voter Information Pamphlet, the Sportsmen state that “[t]he protection of fair chase hunting, as an ethical consideration for Montanans, was an integral part of I-143’s provisions to eliminate penned shoots.”
¶113 1-143, however, contains no “provisions to eliminate penned shoots.” 1-143 did three things: it prohibited the establishment of any new alternative livestock ranches; it revoked the right of existing alternative livestock businesses to transfer their alternative livestock ranch licenses; and it prohibited charging a fee or other remuneration for shooting alternative livestock on an alternative livestock facility. See generally Laws of Montana 2001,2000 Ballot Issues, Initiative No.
*245 143, §§ 1, 4, 6. But “shooting an animal in an enclosed facility” is still perfectly legal. Indeed, the Sportsmen concede that “[g]ame farm operators are not prohibited by 1-143 from shooting or otherwise ‘harvesting5 their animals themselves.” For that matter, 1-143 does not prohibit the friends, relatives, and acquaintances of an alternative livestock operator from shooting alternative livestock on an alternative livestock ranch. “The only activity on licensed game farms prohibited under 1-143,” the Sportsmen state, “is that of allowing a fee-paying individual the opportunity to personally shoot a game farm animal.” But anyone who is not a “fee-paying individual55 may still participate in penned hunts and “personally shoot a game farm animal” notwithstanding 1-143. So much for protecting Montana’s “proud heritage” of ethical, fair-chase hunting.
¶ 114 Lastly, with respect to European-style privatization of wildlife, the Sportsmen state that “[c]entral to Montana’s hunting heritage is the availability of big game hunting to ordinary individuals: inexpensive licenses available to all citizens, access to big game on public and private lands... and plentiful populations of native wildlife.” According to the Sportsmen, “I-143’s proponents made this a central issue in their campaign to ban penned shoots” (citing the 2000 Voter Information Pamphlet). Yet, as the Sportsmen are forced to concede, “1-143 allow[s] the continued ownership of game farms and elk,” and alternative livestock ranchers “are free to ‘acquire, breed, grow, pursue, handle, sell or dispose’ of game farm animals” in Montana. Moreover, 1-143 does not provide for less expensive hunting licenses or greater access to big game on public and private lands.
¶115 In smn, the Sportsmen’s initiative purported to address disease, hunting ethics, and privatization of wildlife, but 1-143 did not actually address any of these. Rather, it was “carefully crafted” to achieve the Sportsmen’s ulterior goal of putting all alternative livestock ranches out of business. The Proponents’ argument in favor of the Initiative was blatantly misleading in assuring voters that “[e]xisting game farms will be allowed to continue all operations, except for canned hunts.” 1-143 was designed to shut down all alternative livestock ranches by forcing them to operate with no income.
¶116 The Sportsmen claim that 1-143 merely “added to the existing restrictions” on the operation of alternative livestock ranches. They also assert that the Ranchers have not established that the “additional restrictions” are “so onerous that the effect is the same as ‘an appropriation of property through eminent domain or physical *246 appropriation.’ ” This is hypocrisy personified. 1-143 did not “add” to “existing restrictions.” It devised a whole new restriction previously unheard of in the industry: no remuneration for shooting alternative livestock. The Sportsmen’s contrary characterization of 1-143 is absurd. It is one thing to strengthen fencing, testing, and reporting requirements through “additional restrictions,” as the Legislature did over the years. But it is quite another to require alternative livestock ranchers to operate with no income through the expedient of prohibiting remuneration for the key economic activity on which their businesses depended: fee shooting. The Sportsmen “carefully crafted” 1-143 to destroy the Ranchers’ businesses, and they succeeded in doing so. It is difficult to conceive of a regulation that more closely approximates “an appropriation of property.”
¶117 In conclusion, the Ranchers entered the alternative livestock industry in the 1990s. Alternative livestock ranching had been in existence for over 75 years. The 1983 Legislature had enacted explicit statutory rights to protect the interests of participants in the industry. See Kafka Dissent, ¶¶ 105-106. As late as 1999, the State characterized alternative livestock ranching as “a viable economic opportunity for any private property owner as well as the traditional livestock producers who are interested in diversifying their ranch productivity.” Section 87-4-431, MCA. Moreover, as the State reluctantly conceded at oral argument in Kafka, “There is some evidence to suggest that it was the policy of the political branches of government to encourage people to look at game farming as an alternative to traditional agriculture-actually, to subsidize traditional agriculture so they could stay on the farms and ranches.” The Sportsmen, however, objected to alternative livestock ranching. They decided to shut down the industry. They did so for the stated purpose of “protecting Montana’s wildlife and hunting heritage.” They argued to the voters that 1-143 was intended to benefit the entire Montana populace. Yet, the Sportsmen sought to place all of the economic costs associated with achieving this goal on the alternative livestock ranchers. They sought, in other words, to give the public something for nothing.
¶118 The Sportsmen “represent the voices of thousands of Montana men and women who believe 1-143 is vital to the protection of Montana’s wildlife and to the tradition of fair chase hunting.” According to the Sportsmen, “1-143 was designed and enacted to address very serious dangers to Montana’s wildlife and fair chase hunting heritage.” It has been said that the “guarantee that private property shall not be taken for a public use without just compensation *247 was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.” Armstrong v. United States, 364 U.S. 40, 49, 80 S. Ct. 1563, 1569 (1960). On this principle alone, it seems abundantly obvious that the costs of achieving the Sportsmen’s goals must be borne by the public as a whole, not disproportionately placed on the shoulders of the alternative livestock ranchers.
B. The State’s and the Ranchers’ Means-Ends Arguments
¶119 The State asserts that a “means-ends” analysis of I-143-i.e., inquiring whether the Initiative substantially advances some legitimate public purpose-is improper in the takings context. The State is correct, at least with respect to the Fifth Amendment. The Supreme Court has explained that the critical question in a regulatory takings analysis is whether the regulation is “so onerous that its effect” is “functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain.” Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537, 539, 125 S. Ct. 2074, 2081, 2082 (2005). A “substantially advances” test is ineffective for answering this question. It reveals nothing about the magnitude or character of the burden that the regulation imposes upon private property rights. Rather, it probes the regulation’s underlying validity. Lingle, 544 U.S. at 542, 543, 125 S. Ct. at 2084. Yet,
such an inquiry is logically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose. The Clause expressly requires compensation where government takes private property for public use. It does not bar government from interfering with property rights, but rather requires compensation in the event of otherwise proper interference amounting to a taking. Conversely, if a government action is found to be impermissible-for instance because it fails to meet the “public use” requirement or is so arbitrary as to violate due process-that is the end of the inquiry. No amount of compensation can authorize such action.
Lingle, 544 U.S. at 543, 125 S. Ct. at 2084 (citation and some internal quotation marks omitted).
¶120 The Ranchers acknowledge the Supreme Court’s clarifications of federal takings doctrine in Lingle; however, they point out that “Lingle did not, and in fact could not, foreclose an independent interpretation of the Montana Constitution.” The Ranchers suggest that under Article II, Section 29, “[i]n order to avoid the constitutional *248 mandate of just compensation, the State must show a compelling state interest that is narrowly tailored to impose the least restraints possible on [the Ranchers’] interests.” In an alternative formulation, the Ranchers assert that “the State must demonstrate that it has employed the least restrictive means in accomplishing the purposes of 1-143.” While I agree with the Ranchers that this Court may-indeed, must — provide an independent interpretation of Article II, Section 29, I agree with the State that the Ranchers’ proposed test is inapt for analyzing claims brought under Article II, Section 29.
¶121 Article II, Section 29 states, in pertinent part, that “[p]rivate property shall not be taken or damaged for public use without just compensation to the full extent of the loss.” This language requires compensation where the State takes or damages private property “for public use,” but it does not require the “public use” to be “compelling,” nor does it require the State to employ “the least restrictive means” for achieving its goals. Rather, when considering whether a regulation has taken or damaged private property, the analysis presupposes that the regulation is permissible and the focus is properly directed to the regulation’s “effect” on the property and whether just compensation is owed. Cf. Lingle, 544 U.S. at 537, 543, 125 S. Ct. at 2081, 2084.
¶122 It thus makes little sense to inquire whether the State has employed “the least restrictive means” of achieving a “compelling” state interest. Whether or not the State has done so may tell us whether the regulation sweeps more broadly than is necessary or whether the regulation fails to meet the “public use” requirement. But it tells us nothing about the regulation’s effect and the burden the regulation imposes on private property rights. In other words, it does not tell us whether property has been taken or damaged.
¶123 Moreover, even if the least restrictive means have been employed and even if the State’s interest is compelling, the property owner still may have suffered a taking or damaging of property. In this connection, the following reasoning by the Supreme Court in Lingle is persuasive:
The owner of a property subject to a regulation that effectively serves a legitimate state interest may be just as singled out and just as burdened as the owner of a property subject to an ineffective regulation. It would make little sense to say that the second owner has suffered a taking while the first has not. Likewise, an ineffective regulation may not significantly burden property rights at all, and it may distribute any burden broadly and evenly among property owners. The notion that such a *249 regulation nevertheless “takes” private property for public use merely by virtue of its ineffectiveness or foolishness is untenable.
Lingle, 544 U.S. at 543, 125 S. Ct. at 2084. For these reasons, the Supreme Court’s rejection of means-ends analysis under the Fifth Amendment is sensible and should apply equally under Article II, Section 29.
¶124 That said, the State inexplicably proceeds to argue the converse of the Ranchers’ proposed test. The State asserts that “property rights are subject to reasonable exercise of the police power” and that Article II, Section 29 does not “alter in a fundamental way the police power to adopt reasonable regulations that protect public health, safety, and welfare.” Based on Mugler v. Kansas, 123 U.S. 623, 8 S. Ct. 273 (1887), the State insists that “the government cannot be compelled to pay compensation whenever it reasonably determines that a commercial activity is injurious to public health, safety, or welfare.”
¶125 The State’s position, in short, is that it cannot be required to pay compensation where the challenged regulation is a valid exercise of the police power related to a commercial activity. Of course, the corollary of this rule is that the government can be required to pay compensation where the challenged regulation is an invalid exercise of the police power related to a commercial activity-the very proposition the State goes to great lengths to refute. But there are additional flaws in the State’s approach.
¶126 First, Mugler stands for the limited proposition that the government need not pay compensation when it exercises its power to prohibit a noxious use of property, i.e., a use akin to a public nuisance. See Kafka Dissent, ¶¶ 126-129. However, alternative livestock ranching, which was done and maintained under the express authority of Title 87, chapter 4, part 4, MCA, was in no way a public nuisance, see § 27-30-101(2), MCA, and the State may not escape paying just compensation for the Ranchers’ losses through the mere expedient of declaring that which formerly was not a public nuisance to have been a public nuisance all along, see Kafka Dissent, ¶¶ 132-134. In this regard, the State’s smug condemnation of the alternative livestock industry as some sort of noxious or abhorrent threat to the public health, safety, and welfare rings hollow in light of the State’s 83-year role in creating, developing, and nurturing the industry in the first place.
¶127 Second, the Supreme Court has explicitly rejected the notion that a valid police power regulation never requires compensation to the owner. In Lucas v. South Carolina Coastal Council, 505 U.S. 1003, *250 112 S. Ct. 2886 (1992), the Court stated that there are “limits to the noncompensable exercise of the police power.” Lucas, 505 U.S. at 1026, 112 S. Ct. at 2899. Otherwise, if “the uses of private property were subject to unbridled, uncompensated qualification under the police power, ‘the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappeared].’ ” Lucas, 505 U.S. at 1014, 112 S. Ct. at 2892-93 (brackets in Lucas) (quoting Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S. Ct. 158, 160 (1922)).
¶128 In conclusion, whether 1-143 employs “the least restrictive means” of achieving a “compelling” state interest is irrelevant to the analysis under Article II, Section 29. Rather, in considering whether the Initiative took or damaged the Ranchers’ property, the analysis presupposes that the regulation is permissible and the focus is on the regulation’s effect on the Ranchers’ property. Likewise, and for the same reasons, the State cannot escape paying just compensation on the ground that 1-143 represents a “reasonable] determin[ation] that [alternative livestock ranching] is injurious to public health, safety, or welfare.”
III. ANALYSIS OF THE RANCHERS’ CLAIMS A. Analytical Framework
¶129 The Ranchers brought this action to recover for a regulatory taking or damaging of their property caused by the passage of 1-143. Such an action, “in which a property owner, in the absence of a formal condemnation proceeding, seeks to recover from a governmental entity for the appropriation of his property interest,” is commonly referred to as “inverse condemnation.” Julius L. Sackman, Nichols on Eminent Domain vol. 2A, § 6.03[2], 6-182.1 (3d ed., Matthew Bender 2006). Whereas a condemnation proceeding typically involves an action by the condemnor to acquire title to property, inverse condemnation is an action by the property owner against a governmental defendant to recover the value of property that has been taken or damaged, even though no formal exercise of the power of eminent domain has been attempted by the government. See United States v. Clarke, 445 U.S. 253, 257, 100 S. Ct. 1127, 1130 (1980); see also e.g. Less v. City of Butte, 28 Mont. 27, 72 P. 140 (1903) (inverse condemnation action to recover for damage to property occasioned by a public works project); First English Evangelical Lutheran Church v. Los Angeles County, 482 U.S. 304, 316, 107 S. Ct. 2378, 2386 (1987) (“While the typical taking occurs when the government acts to condemn property in the exercise of its *251 power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings.”). “Such a suit is ‘inverse’ because it is brought by the affected owner, not by the condemnor. The owner’s right to bring such a suit derives from the self-executing character of the constitutional provision with respect to condemnation.” Kirby Forest Industries, Inc. v. United States, 467 U.S. 1, 5 n. 6, 104 S. Ct. 2187, 2191 n. 6 (1984) (citation and some internal quotation marks omitted).
¶130 As noted, Article II, Section 29 states, in pertinent part, that “[plrivate property shall not be taken or damaged for public use without just compensation to the full extent of the loss.” In analyzing a claim for just compensation in the context of an inverse condemnation action, the court first determines whether the plaintiff possesses a constitutionally protected property interest. See Germann v. Stephens, 2006 MT 130, ¶ 27, 332 Mont. 303, ¶ 27, 137 P.3d 545, ¶ 27; Seven Up Pete Venture v. State, 2005 MT 146, ¶ 26, 327 Mont. 306, ¶ 26, 114 P.3d 1009, ¶ 26; see also Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1000, 104 S. Ct. 2862, 2871 (1984) (articulating the same threshold inquiry under federal law). Whether one has a protected property interest is a question of law. Kiely Construction v. City of Red Lodge, 2002 MT 241, ¶ 25, 312 Mont. 52, ¶ 25, 57 P.3d 836, ¶ 25. If the plaintiff possesses a protected property interest, the court then determines whether a part or a whole of that interest has been taken or damaged for public use, thus entitling the plaintiff to just compensation. See Mont. Const. art. II, § 29; Monsanto, 467 U.S. at 1000-01, 104 S. Ct. at 2871; Members of Peanut Quota Holders Ass’n v. United States, 421 F.3d 1323, 1330 (Fed. Cir. 2005). The issue of whether a taking has occurred is a question of law based on factual underpinnings. Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1377 (Fed. Cir. 2008).
B. Analysis of the Ranchers’ Claims under Article II, Section 29
1. General Approach
¶131 It is well-established that the rights enumerated in the Declaration of Rights of Montana’s 1972 Constitution (i.e., those set forth in Article II) are “fundamental rights.” Walker v. State, 2003 MT 134, ¶ 74, 316 Mont. 103, ¶ 74, 68 P.3d 872, ¶ 74; State v. Tapson, 2001 MT 292, ¶ 15, 307 Mont. 428, ¶ 15, 41 P.3d 305, ¶ 15; Wadsworth v. State, 275 Mont. 287, 299, 911 P.2d 1165, 1172 (1996). This means that each of the Article II rights is a significant component of liberty, the alleged infringement of which triggers the highest level of scrutiny *252 and, thus, the highest level of protection by the courts. Walker, ¶ 74; Wadsworth, 275 Mont. at 302, 911 P.2d at 1174; see also e.g. State v. Mount. 2003 MT 275, ¶ 98, 317 Mont. 481, ¶ 98, 78 P.3d 829, ¶ 98; Mont. Environmental Info. Center v. Dept. of Environmental Quality, 1999 MT 248, ¶ 64, 296 Mont. 207, ¶ 64, 988 P.2d 1236, ¶ 64. For the reasons discussed earlier in Part II-B, our analysis under Article II, Section 29 does not involve “scrutiny” of the governmental action, except insofar as the requirement of a “public use” has been raised. But our analysis must afford “the highest level of protection” of private property rights. Walker, ¶ 74.
¶ 132 In this connection, we interpret Article II rights mindful of the other rights set out in the Montana Constitution. In Armstrong v. State, 1999 MT 261, 296 Mont. 361, 989 P.2d 364, we explained that
Montana’s Constitution, and especially the Declaration of Rights, is not simply a cook book of disconnected and discrete rules written with the vitality of an automobile insurance policy. Rather, our Constitution, and in particular its Declaration of Rights, encompasses a cohesive set of principles, carefully drafted and committed to an abstract ideal of just government. It is a compact of overlapping and redundant rights and guarantees.
Armstrong, ¶ 71.
¶133 We accordingly have interpreted independent sections of Montana’s Constitution together, so as to give effect to Article II’s coordinate, overlapping, and redundant guarantees. Possibly the most repeated example of this is our interpretation of the right not to be subjectedto unreasonable searches and seizures (Article II, Section 11) in conjunction with the right to privacy (Article II, Section 10). See e.g. State v. Siegal, 281 Mont. 250, 257-78, 934 P.2d 176, 180-92 (1997), overruled in part on other grounds, State v. Kuneff, 1998 MT 287, ¶ 19, 291 Mont. 474, ¶ 19, 970 P.2d 556, ¶ 19.[2]
¶134 In Siegal, we explained that
while we analyze most search and seizure questions implicating Article II, Section 11 of Montana’s Constitution under traditional Fourth Amendment principles enunciated by the federal courts and adopted in our own case law, in certain instances where *253 Montana’s constitutional right of privacy, Article II, Section 10, is also specially implicated, we must, of necessity, consider and address the effect of that unique constitutional mandate on the question before us.
Siegal, 281 Mont. at 264-65, 934 P.2d at 184. Similarly, in Walker, we reasoned:
Just as we read the privacy provision of the Montana Constitution in conjunction with the provisions regarding search and seizure to provide Montanans with greater protections from government intrusion, so too do we read the dignity provision of the Montana Constitution together with Article II, Section 22 to provide Montana citizens greater protections from cruel and unusual punishment than does the federal constitution. The federal constitution does not expressly provide for the right to human dignity.
Walker, ¶ 73. We thus have recognized that while traditional principles enunciated by the federal courts and adopted in our own caselaw may inform our analysis, our decision must ultimately take account of the unique structure of the Montana Constitution and, in particular, the coordinate, overlapping, and redundant guarantees of Article II.
¶135 In the present case, therefore, the fundamental right to just compensation to the full extent of the loss for a taking or damaging of private property must be interpreted mindful of other pertinent rights in the Montana Constitution. One such right is the “inalienable” right of “acquiring, possessing and protecting property.” Mont. Const. art. II, § 3. In City of Bozeman v. Vaniman, 264 Mont. 76, 869 P.2d 790 (1994), we observed that “[pjrivate real property ownership is a fundamental right, Art. II, § 3, Mont. Const., and any statute which allows the government to take a person’s property must be given its plain interpretation, favoring the person’s fundamental rights.” Vaniman, 264 Mont. at 79, 869 P.2d at 792. We reaffirmed this principle in McCabe Petroleum Corp. v. Easement and Right-of-Way, 2004 MT 73, 320 Mont. 384, 87 P.3d 479, stating that “because eminent domain interferes with the fundamental right of private ownership of real property, any statute which allows a condemnor to take a person’s property must be strictly construed, giving the statute its plain interpretation, but favoring the person’s fundamental rights .’’McCabe, ¶ 28 (citing Vaniman, 264 Mont. at 79, 869 P.2d at 792). Although these two cases refer to “real property,” we have never excluded other types of property-e.g., personal, intangible, and intellectual-from the principle that “any statute which allows a condemnor to take a *254 person’s property must be strictly construed, giving the statute its plain interpretation, but favoring the person’s fundamental rights.” Indeed, there is no basis in the constitutional text for limiting this principle to “real property,” given that Article II, Section 3 recognizes the inalienable right to acquire, possess, and protect “property,” not just “real property.”
¶136 With this general approach in mind, I turn to the questions of whether the Ranchers possess constitutionally protected property interests and whether a part or a whole of those interests has been taken or damaged for public use.
2. Whether the Ranchers Possess Constitutionally Protected Property Interests
¶137 The Constitution protects, but does not create, property interests. Seven Up Pete, ¶ 26; Phillips v. Washington Legal Foundation, 524 U.S. 156, 164, 118 S. Ct. 1925, 1930 (1998). Rather, property interests “are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.” Monsanto, 467 U.S. at 1001, 104 S. Ct. at 2872 (internal quotation marks omitted); accord Seven Up Pete, ¶ 26; Germann, ¶ 27. Critically, the term “property,” as used in Article II, Section 29, contains only one qualifier: “[pjrivate.” It is not otherwise restricted to any particular type of property. Rather, by its terms, the constitutional requirement of just compensation applies broadly to “[pjrivate property.”
¶138 Notably, the term “private property,” as used in the Fifth Amendment’s Takings Clause, encompasses a wide variety of interests. It includes real property, personal property, and intangible property. Huntleigh, 525 F.3d at 1377-78. It also “ ‘denote[s] the group of rights inhering in the citizen’s relation to the physical thing, as the right to possess, use and dispose of it.’ ” PruneYard Shopping Center v. Robins, 447 U.S. 74, 82 n. 6, 100 S. Ct. 2035, 2041 n. 6 (1980) (brackets in PruneYard) (quoting United States v. General Motors Corp., 323 U.S. 373, 378, 65 S. Ct. 357, 359 (1945)). Property interests “are about as diverse as the human mind can conceive,” Florida Rock Industries v. United States, 18 F.3d 1560, 1572 n. 32 (Fed. Cir. 1994), and the Takings Clause is addressed to “every sort of interest the citizen may possess,” General Motors, 323 U.S. at 378, 65 S. Ct. at 359.
¶139 The premise underlying these open-ended definitions of “property” is that the term is not frozen in time to the conceptions of “property” existing in 1791, but rather takes its meaning from contemporary understandings. Indeed, the Supreme Court has stated *255 as much. See e.g. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1030, 112 S. Ct. 2886, 2901 (1992) (noting the Supreme Court’s “traditional resort to ‘existing rules or understandings that stem from an independent source such as state law’ to define the range of interests that qualify for protection as ‘property’ under the Fifth and Fourteenth Amendments” (emphasis added)). There is no reason to construe the term “property” in Article II, Section 29 differently. Nothing in the text or history of this provision and its predecessor (Article III, Section 14 of the 1889 Constitution) suggests that the meaning of “property” and the rights associated with ownership are limited to the conceptions existing in 1889 or 1972. To the contrary, given that the term is only qualified by the word “private,” the reasonable conclusion is that “property” in Article II, Section 29 (as in the Fifth Amendment) takes its meaning from contemporary understandings.
¶140 The Montana Code defines “property” broadly. It is not simply land, a fence, a car, or some office furniture. It is anything that a person has the right to possess and use to the exclusion of others. Section 70-1-101, MCA. By way of example, property interests exist in “all inanimate things which are capable of appropriation or of manual delivery,” “all domestic animals,” “all obligations,” “such products of labor or skill as the composition of an author, the goodwill of a business, trademarks, and signs,” and “rights created or granted by statute.” Section 70-1-104, MCA. Nothing in Montana property law, however, suggests that the meaning of “property” depends on arbitrarily drawn lines or rigidly constrictive tests devised by the federal courts. The Court’s adoption of such tests in Kafka (see Kafka Opinion, ¶ 46)-thereby restricting the definition of “property” under Article II, Section 29 to those interests which satisfy the standards created by courts of some other jurisdiction not accountable to Montanans-is indefensible.
¶141 In the present case, the Ranchers seek just compensation for the taking or damaging of several property interests: “their alternative livestock business, inventory, and equipment,” which includes “fixtures,” “facilities,” and the alternative livestock. The State, the Sportsmen, and the Court do not dispute that these are compensable property interests; however, before proceeding to the question of whether a part or a whole of these interests has been taken or damaged for public use, I note the following considerations regarding the Ranchers’ businesses. In the same way that the opportunity to pursue employment is a necessary incident to the fundamental right *256 (under Article II, Section 3) to pursue life’s basic necessities, Wadsworth, 275 Mont. at 299, 911 P.2d at 1172, the opportunity to operate one’s business as a going concern is a necessary incident to the fundamental right (also under Article II, Section 3) to acquire, possess, and protect property. Indeed, operating one’s business as a going concern is, like employment, the vehicle by which many Montanans pursue life’s basic necessities; and the property interests associated with a going business are, therefore, entitled to the highest level of protection by this Court.
3. Whether a Part or a Whole of the Ranchers’ Property Interests has been Taken or Damaged for Public Use
¶142 Article II, Section 29 guarantees just compensation to the full extent of the loss where private property has been “taken or damaged for public use.” The Ranchers do not contend that the “public use” requirement has not been met; thus, the only question here is whether their property has been “taken or damaged.”
¶143 The Court is of the view that Article II, Section 29 applies only to eminent domain proceedings and inverse condemnation actions arising out of, or related to, a direct appropriation of property. See Opinion, ¶¶ 67-69. The Court asserts that Article II, Section 29 provides no protection whatsoever against property loss or damage occasioned by government regulation. Opinion, ¶ 69. This, of course, moots the difficult question of how far is “too far” under Article II, Section 29. Cf. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S. Ct. 158, 160 (1922) (“The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.”). Apparently now, no regulation ever goes “too far” under the Montana Constitution.
¶144 As noted, I strenuously disagree with this emasculation of Article II, Section 29. Tellingly, the Court’s corresponding analysis is “as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had been starved to death.” Abraham Lincoln, Sixth Debate with Stephen A. Douglas, at Quincy, Illinois (Oct. 13,1858), in The Collected Works of Abraham Lincoln vol. 3, 245, 279 (Roy P. Basler ed., Rutgers University Press 1953).
¶145 First, the Court misstates that Article II, Section 29 was *257 adopted “verbatim” from the 1889 Constitution.[3] Opinion, ¶ 65. The Court then cites Less v. City of Butte, 28 Mont. 27, 72 P. 140 (1903), and Knight v. City of Billings, 197 Mont. 165, 642 P.2d 141 (1982), for the proposition that “the ‘or damaged’ language of the provision has been interpreted to apply to eminent domain proceedings, including inverse condemnation proceedings, where private property is taken or damaged for public use.” Opinion, ¶¶ 65-67. Of course, this proposition does not establish that the “or damaged” language applies only to those contexts. Neither Less nor Knight involved a regulation of property, and neither case confined the “or damaged” clause in the way the Court now declares. For that matter, the Court’s reliance on Knight is highly questionable given our statement that our “holding is limited to the situation here, where a physical taking across the street occurred.” Knight, 197 Mont. at 174, 642 P.2d at 146. In any event, Less and Knight simply do not stand for the Court’s assertion that Article II, Section 29 does not recognize a taking or damaging of property caused by government regulation.
¶146 Next, the Court cites Customer Co. v. City of Sacramento, 895 P.2d 900 (Cal. 1995), for the proposition that California’s “or damaged” clause does not apply beyond the ambit of eminent domain and public improvements. Opinion, ¶ 68. Customer Co., however, did not involve a claim based on government regulation of property. Rather, it involved a claim that just compensation is owed when public employees (e.g., law enforcement officers), in the pursuit of their public duties, cause damage to private property. The court held that the public entities involved may be held liable, if at all, only in a tort action, not an inverse condemnation action. Customer Co., 895 P.2d at 901. Customer Co. is also inapposite.
¶147 Moreover, assuming, as does the Court, that the high courts of sister states may dictate the meaning of the Montana Constitution, I note that the North Dakota Supreme Court has applied Article I, Section 16 of the North Dakota Constitution to a regulatory taking or *258 damaging claim. See Wild Rice River Estates, Inc. v. City of Fargo, 705 N.W.2d 850 (N.D. 2005). This provision, like Article II, Section 29, states that “[p]rivate property shall not be taken or damaged for public use without just compensation having been first made to, or paid into court for the owner.” N.D. Const. art. I, § 16. Notably, the North Dakota Supreme Court has said that this constitutional provision “is broader in some respects than its federal counterpart because the state provision was intended to secure to owners, not only the possession of property, but also those rights which render possession valuable.” Wild Rice, ¶ 16 (internal quotation marks omitted). Likewise, Article I, Section 16 of the Washington Constitution states that “[n]o private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner.” In Manufactured Housing Communities v. State, 13 P.3d 183 (Wash. 2000), the Washington Supreme Court observed that “a regulation” can violate Article I, Section 16 when it “effects a total taking of all economically viable use of one’s property,” “has resulted in an actual physical invasion upon one’s property,” “destroys one or more of the fundamental attributes of ownership (the right to possess, exclude other and to dispose of property),” or “[was] employed to enhance the value of publicly held property.” Manufactured Housing, 13 P.3d at 187. Similarly, in Alaska,
Article I, section 18 of the Alaska Constitution provides that “[p]rivate property shall not be taken or damaged for public use without just compensation.” Property owners enjoy broader protection under the Alaska Constitution than under the Fifth Amendment of the United States Constitution.
R & Y, Inc. v. Municipality of Anchorage, 34 P.3d 289, 293 (Alaska 2001). The Alaska Supreme Court has applied this “broader protection” to government regulations. See R &Y, 34 P.3d at 293-96.
¶148 The Court evidently overlooks these cases (and perhaps others), accusing this Dissent of not citing “a single case” for the proposition that the “or damaged” language is “intended to provide any greater protections in the regulatory taking context than does the Fifth Amendment to the U.S. Constitution, or that it applies to anything other than the consequential damages to the property of persons affected by a physical condemnation, or similar actions, initiated by the State.” Opinion, ¶ 69.
¶149 Lastly, the Court turns to the actual language of Article II, Section 29. The Court asserts that neither the 1889 nor the 1972 Constitutions “evince any intent that [the “or damaged” language of *259 Article II, Section 29] apply to regulatory takings or damages resulting therefrom.” Opinion, ¶ 69. There are two obvious problems with this assertion. First, as explained above, the language of Article II, Section 29 must be interpreted so as to give effect to Article II’s coordinate, overlapping, and redundant guarantees-a point the Court utterly fails to address. Second, the Court’s assertion could also be made about the Fifth Amendment’s Takings Clause, which simply states: “nor shall private property be taken for public use, without just compensation.” There is no more reason to conclude that this language encompasses regulatory takings than there is to conclude that the pertinent language of Article II, Section 29 (“Private property shall not be taken or damaged for public use without just compensation.”) encompasses regulatory takings. Yet, the former does encompass regulatory takings, see Penn Central Transp. Co. v. New York City, 438 U.S. 104, 98 S. Ct. 2646 (1978), as the Court concedes, see Opinion, ¶ 74. If Justice Holmes can perceive in the language of the Fifth Amendment’s Takings Clause the notion that “if regulation goes too far it will be recognized as a taking,” Mahon, 260 U.S. at 415, 43 S. Ct. at 160, we can reasonably conclude that he would perceive the same principle in the language of Article II, Section 29, which is identical in all pertinent respects aside from the additional words “or damaged.”
¶150 As a final point, the Court reasons that because Article II, Section 29 states that private property shall not be taken or damaged for public use without just compensation “having been first made to or paid into court for the owner,” Article II, Section 29 “obviously” contemplates only a condemnation of property. Opinion, ¶ 69. I disagree for the simple reason that the Court’s interpretation is inconsistent with the “or damaged” clause and leads to an absurd result. The clause relied on by the Court (“having been first made to or paid into court for the owner”) requires the State to pay just compensation “to the full extent of the loss” in advance. Certainly, this may be done when the State sets out to “take” property. But it is pure folly to suggest that the State may do the same with respect to “damaging” property. How could it possibly be known, in advance, all of the properties that will be damaged during the course of a public works project and what “the full extent of the loss” will be? “Obviously,” it cannot be known. The Court creates an absurd result by applying the advance-payment clause to the damaging clause. Cf. In re Marriage of McMichael, 2006 MT 237, ¶ 14, 333 Mont. 517, ¶ 14, 143 P.3d 439, ¶ 14 (“We interpret a statute to give effect to its purpose and to avoid absurd results.”).
*260 ¶151 In sum, there is nothing in the text of Article II, Section 29 limiting its applicability in the way the Court does today. Article II, Section 29 states:
Private property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court for the owner. In the event of litigation, just compensation shall include necessary expenses of litigation to be awarded by the court when the private property owner prevails.
If the State passes a regulation permitting a telecommunications company to run a fiber optic cable through private lands, there is no textual basis for concluding that the property owners cannot prevail under Article II, Section 29 on a claim that their property has been “taken or damaged.” Cf. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S. Ct. 3164 (1982). If the State passes a regulation completely depriving a property owner of all economically beneficial use of her property, there is no textual basis for concluding that the property owner cannot prevail under Article II, Section 29 on a claim that her property has been “taken or damaged.” Cf. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S. Ct. 2886 (1992). If the State passes a regulation destroying one or more of the fundamental attributes of ownership, there is no textual basis for concluding that the property owner cannot prevail under Article II, Section 29 on a claim that her property has been “taken or damaged.” Cf. Manufactured Housing Communities v. State, 13 P.3d 183, 187 (Wash. 2000).
¶152 The Court’s contrary interpretation, limiting the reach of Article II, Section 29 to direct appropriations, amounts to the improper insertion of language into the provision. Cf. § 1-2-101, MCA (“In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.”). Article II, Section 29 does not in any way describe, define, or circumscribe the ways in which private property may be “taken or damaged.” It simply states, “Private property shall not be taken or damaged for public use ....” Clearly, property is “taken” for public use in an eminent domain proceeding. Property may also be “damaged” as a result of a public works project. But I reject the Court’s assertion that property cannot be “taken or damaged” for public use by government regulation. Nothing in the text of Article II, Section 29 requires such a construction. In fact, given that the Fifth Amendment’s *261 Takings Clause reaches regulatory takings, and given that Article II, Section 29 is facially broader than the Fifth Amendment, the logical conclusion is that Article II, Section 29 also reaches regulatory takings (and damagings).
¶153 The notion of construing Article II, Section 29 more broadly than its federal counterpart is well-established. In Less v. City of Butte, 28 Mont. 27, 72 P. 140 (1903), this Court stated:
Constitutions which provide that “private property shall not be taken for public use without just compensation” are but declaratory of the common law, and contemplate the physical taking of property only. Under constitutions which provide that property shall not be “taken or damaged” it is universally held that “it is not necessary that there be any physical invasion of the individual’s property for public use to entitle him to compensation.”
Less, 28 Mont. at 32, 72 P. at 141. The Less Court’s restrictive interpretation of the Fifth Amendment’s Takings Clause as contemplating only a “physical taking” is clearly no longer valid. See e.g. Penn Central Transp. Co. v. New York City, 438 U.S. 104, 98 S. Ct. 2646 (1978) (recognizing regulatory takings under the Fifth Amendment). That, however, is not the point. Rather, the point is that the damaging clause was intended, from its inception, to provide a broader range of protection than the Fifth Amendment, as interpreted in extant jurisprudence, provides. It is untenable to suggest, as the Court does today, that while the reach of the Fifth Amendment’s Takings Clause (ratified in 1791) grew broader over time to accommodate changing needs, the reach of Article III, Section 14 (1889) and, subsequently, Article II, Section 29 (1972) remained frozen in time.
¶154 In support of this originalist approach to constitutional interpretation, the Court relies on the fact that the delegates’ discussion of Article II, Section 29 during the 1972 Constitutional Convention centered primarily on taking property for highway purposes. Opinion, ¶ 67. This discussion, however, is inapposite. The delegates were considering a motion by Delegate Davis to strike the clause “having been first made to or paid into court for the owner.” See Montana Constitutional Convention, Verbatim Transcript, March 9, 1972, pp. 1826-27. (Notably, Delegate Davis pointed out that “I don’t think that you can make a determination of what the full extent of the loss is until after the construction takes place.” Verbatim Transcript, p. 1826.) But the delegates did not even discuss government regulation *262 of property, let alone express the view that Article II, Section 29 should not apply to government regulations. Their discussion, therefore, does not lend one shred of support to the Court’s proposition that Article II, Section 29 does not apply to regulatory cases.
¶155 In this connection, the Convention transcripts read as a whole support the contrary view that Montana property owners are protected against uncompensated regulatory infringements on their property rights. One cannot read the transcripts of the debates without recognizing that Montana’s Constitution is a progressive constitution. The delegates wrote into our Constitution fundamental rights-protections, really-to protect citizens from the government’s inexorable reach into their lives and property. Article II, Section 3 is an apt example. It guarantees to every person “certain inalienable rights,” including “the right to a clean and healthful environment and the rights of pursuing life’s basic necessities, enjoying and defending their lives and liberties, acquiring, possessing and protecting property, and seeking their safety, health and happiness in all lawful ways.” Recognition of many of these rights as inalienable is unique to Montana’s Constitution.
¶156 Article II, Section 4 recognizes-again, uniquely-that the “dignity” of the human being is “inviolable.” This section also requires the government to treat persons equally under the law, and it prohibits discrimination. Article II, Section 7 states, more broadly than the First Amendment, that every person “shall be free to speak or publish whatever he will on any subject.” Article II, Sections 8 and 9 guarantee the public’s right to participate in governmental decision-making and the right of each person to examine documents and observe the deliberations of all public bodies and agencies. Neither of these rights is protected by the federal constitution.
¶157 The Montana Constitution, unlike its federal counterpart, explicitly protects the right of individual privacy at Article II, Section 10. Montanans enjoy a broader protection of the right to bear arms under Article II, Section 12 than they do under the Second Amendment. The right to vote is explicitly and broadly protected by Article II, Section 13. Article II, Section 15 grants persons under the age of 18 all of the fundamental rights in Article Il-a guarantee not contained in the federal constitution. Article II, Section 16 requires that every person have access to the courts and a speedy remedy for every injury of person, property, or character.
¶158 Article II, Section 18 declares that the State and its governmental subdivisions are subject to suit (i.e., that sovereign *263 immunity is abrogated) except as specifically provided by law. Article II, Section 19 states that the privilege of habeas corpus shall “never” be suspended-a right not provided by the federal constitution. Certain clauses of Article II, Sections 23, 24, 25, and 26 provide guarantees to a greater extent than like provisions of the federal constitution. And Article II, Section 29 is textually broader than the Fifth Amendment’s Takings Clause.
¶159 The delegates intended the Declaration of Rights “ ‘to stand on its own footing and... provide individuals with fundamental rights and protections far broader than those available through the federal system’ ” in order “ ‘to meet the changing circumstances of contemporary life.’ ” Dorwart v. Caraway, 2002 MT 240, ¶ 94, 312 Mont. 1, ¶ 94, 58 P.3d 128, ¶ 94 (Nelson & Trieweiler, specially concurring) (citation omitted). This intent to give the Declaration of Rights “teeth” could not be more apparent than in the delegates’ adoption of another fundamental right, Article II, Section 34. Although this provision guarantees unenumerated rights, and Article II, Section 29’s protections are enumerated, the intention of the Bill of Rights Committee is still pertinent. The Committee considered Section 34 to be “a crucial part of any effort to revitalize the state government’s approach to civil liberties questions” and “the source of innovative judicial activity in the civil liberties field.” Montana Constitutional Convention, Comments on the Bill of Rights Committee Proposal, February 22, 1972, p. 645.
¶160 Yet, against this backdrop of broader fundamental rights, the Court today eviscerates the protections of Article II, Section 29 by declaring this section to provide no more protection than does the Fifth Amendment. Opinion, ¶¶ 69, 74. To make matters worse, the Court chooses to march lockstep with the confused muddle of Fifth Amendment jurisprudence.[4]1 simply cannot abide the Court’s decision. *264 It ignores the plain language of Article II, Section 29. It ignores the interconnectedness of the Article II rights-in particular here, the right to acquire, possess, and protect property (Article II, Section 3) and the right to just compensation for a taking or damaging of that property (Article II, Section 29). It ignores the broad property rights statutorily defined in §§ 70-1-101 and -104, MCA. And it ignores the overriding theme and fabric of the Declaration of Rights: to protect the fundamental rights of Montanans irrespective of how those rights may be interpreted under like provisions of the federal constitution and to “revitalize” the government’s approach to civil liberties.
¶ 161 Long ago, when Montana first joined the Union, the citizens of this state were unwilling to leave their property rights to the whims of the property-related provisions of the federal constitution and the Supreme Court’s interpretations of those provisions. Rather, they included in our Constitution an explicit assurance that private property would not be taken or damaged for public use without just compensation. Mont. Const. art. III, § 14 (1889). This provision was carried forward into the 1972 Montana Constitution, with the additional requirement that compensation be provided “to the full extent of the loss”-language which clarifies unequivocally that whether property was taken or damaged depends not on what the government got, but on what the property owner lost. Mont. Const. art. II, § 29 (1972).
¶162 It is this Court’s responsibility-indeed, its obligation-to acknowledge Article II, Section 29 as the free-standing provision it is and not relegate it to the status of a mere constitutional redundancy. We previously recognized this obligation in Gas Products Co. v. Rankin, 63 Mont. 372, 207 P. 993 (1922), when we refused to ignore our own Constitution and simply adopt the Supreme Court’s holding in a closely related case:
Were we content to accept the views expressed by the Supreme Court of the United States as the rule of property rights in this state, our task in determining the questions presented would be comparatively easy. However, the danger of establishing such a principle in this state is apparent, and although we entertain the very highest regard and respect for the decisions of the Supreme Court of the United States, we do not feel constrained to follow *265 blindly its determinations affecting the rights of our citizens, especially in view of our own constitutional guaranties....
Since the constitutionality of the act is attacked, both under the federal and state Constitution, we believe it to be our duty, irrespective of the holdings of other courts, to consider and apply the provisions of our own Constitution and general statutes thereto, and declare the rule of property for Montana.
Gas Products, 63 Mont. at 380-81, 388, 207 P. at 994, 996-97.
¶163 Thus, some 86 years ago, this Court announced that it would not blindly follow the determinations of the Supreme Court affecting the property rights of our citizens, and we acknowledged our duty, irrespective of the holdings of other courts, to declare the rule of property for Montana based on the provisions of our own Constitution and general statutes thereto. Gas Products, 63 Mont. at 380-81, 388, 207 P. at 994, 996-97. We have utterly failed in recent years to abide by this approach, choosing instead, as the Court does today, to “look[ ] to federal case law for guidance when considering takings claims brought under Article II, Section 29.” Opinion, ¶ 63. As a result, the confusion and uncertainty encumbering federal regulatory takings jurisprudence (see ¶ 160 n. 4) have infected our own takings jurisprudence. This situation is untenable. It is long past time that we articulate appropriate standards for analysis under Article II, Section 29 and quit allowing federal court decisions to dictate the meaning and substance of Montana’s Constitution.
¶164 Construing Article II, Section 29 in light of the coordinate guarantees in Article II, I conclude that this provision applies to situations in which property is taken or damaged by virtue of government regulation. I further conclude that this provision affords broader protections than the Fifth Amendment’s Takings Clause. Based on these conclusions and the foregoing discussion, I now address whether a part or a whole of the Ranchers’ property interests has been taken or damaged, entitling them to just compensation to the full extent of the loss pursuant to Article II, Section 29. Given the impact of 1-143 on the alternative livestock industry-outright obliteration-I consider this to be a relatively easy question to answer.
¶165 1-143 forced the Ranchers out of business, as it was intended to do. Consequently, the goodwill and going-concern value of the Ranchers’ businesses have been totally destroyed. See Kafka Dissent, ¶¶ 197-211. In this respect, I-143’s effect is dramatic. For all intents and purposes, the Ranchers have been “ousted” from their domain vis *266 á-vis the goodwill and going-concern value of their businesses. Cf. Lingle, 544 U.S. at 539, 125 S. Ct. at 2082 (“Each [of our regulatory-takings inquiries] aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain.”). I would hold that this constitutes not merely a damaging of their businesses, but an outright taking of them.
¶166 The Court reasons that “businesses themselves cannot be taken unless the government physically condemns those businesses and runs them itself.” Opinion, ¶ 89 (citing Kafka, ¶¶ 55-63). This reasoning is lifted, almost verbatim, from the Sportsmen’s appellate brief, where they argue:
The cases in which courts have determined whether “businesses” were even compensable property involve physical appropriation of the property with governmental intent to itself take over the operation of the business it appropriated. See Kimball Laundry Co. v. United States, 335 U.S. 1, 12 (1949); United States v. 0.88 Acres, 760 F. Supp. 210 (W.D. Mich 1987)....
The 0.88 Acres court was emphatic that even where the business property was physically appropriated, “damages for the loss of goodwill or loss of the going-concern value of a business are not compensable unless the government has condemned the business property with the intention of carrying on the business.” Id. emphasis added; See also Kimball Laundry, 335 U.S. at 12 (where the government appropriated a laundry and ran it as a laundry during World War II, compensation for the business was appropriate).
As I explained in Kafka, however, this interpretation of Kimball Laundry is erroneous. See Kafka Dissent, ¶¶ 213-214. Moreover, it is illogical. The rule which the Court and the Sportsmen have completely distorted is that when a business is unable to transfer its goodwill and going-concern value to another location (e.g., because the government has taken over the business, or because transfer is prohibited), then compensation is required. See Kafka Dissent, ¶¶ 208-210.
¶167 As for the Ranchers’ inventory, equipment, fixtures, and facilities-most of which were procured and designed for the specific purpose of alternative livestock ranching and, thus, have little or no salvage value-I would hold that the Ranchers are entitled to just compensation for a damaging of property. Likewise, the Court points out that the Ranchers’ alternative livestock lost roughly 95% of its value as a result of 1-143. See Opinion, ¶ 90 n. 6. Even if the Ranchers *267 have not been deprived of “all” economically viable use of the livestock-a questionable proposition, which the Court asserts in ¶ 80-1 would hold that they are entitled to compensation “to the full extent of the loss,” i.e., for the 95% devaluation. Mont. Const. art. II, § 29.
¶168 In rejecting the Ranchers’ claim with respect to their alternative livestock, the Court asserts that although the Ranchers’ herds were disease free, the Ranchers “knew that their alternative livestock carried with them an inherent danger of spreading CWD which could never be eliminated and which could prove uncontrollable if it made its way into the genetic make-up of the native wildlife populations.” Opinion, ¶ 98. The Court thus concludes that any investment-backed expectations the Ranchers had in their alternative livestock were unreasonable.
¶169 The irony in the Court’s reasoning, which the Ranchers point out in their briefs, is that they would have been better off (as it turns out) if their alternative livestock had contracted CWD. See 9 C.F.R. § 55.2 (“The Administrator is authorized to pay for the purchase and destruction of CWD positive animals, CWD exposed animals, and CWD suspect animals.”). In other words, what the Court fails to recognize is that if the Ranchers should have known that their livestock could contract CWD, thus necessitating destruction, then they had investment-backed expectations in receiving at least something for the livestock. As it is, however, they are receiving nothing because their herds are healthy. That point aside, to the extent Article II, Section 29 requires us to consider the Ranchers’ investment-backed expectations, I do not agree with the Court that those expectations were unreasonable. See Kafka Dissent, ¶¶ 230-238.
¶170 The Court criticizes my analysis as failing to explain how Article II, Section 29 would apply in less-dramatic instances of government regulation of property. Opinion, ¶ 71. It is not necessary, however, to articulate a rule applicable to all possible cases. As the Supreme Court has stated, most regulatory takings require a case-by-case approach. In any event, we cannot refuse to find a taking or damaging of property under Article II, Section 29 on the ground that there may be borderline cases in which we will have to engage in a more complex balancing analysis. Cf. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 436, 102 S. Ct. 3164, 3176 (1982) (“[T]his Court has not declined to apply a per se rule simply because a court must, at the boundary of the rule, apply the rule of reason and engage in a more complex balancing analysis.”). The Court’s criticism is also incongruous, given that the Court refuses to *268 develop any jurisprudence under Article II, Section 29, choosing instead to eviscerate the provision and march lockstep with the federal courts’ pronouncements under the Fifth Amendment. Nevertheless, I note that we purported to adopt and apply a test in Knight v. City of Billings, 197 Mont. 165, 642 P.2d 141 (1982), for determining when property has been damaged: “ ‘whether the interference is sufficiently direct, sufficiently peculiar, and of sufficient magnitude to cause us to conclude that fairness and justice, as between the State and the citizen, requires the burden imposed to be borne by the public and not by the individual alone.’ ” See Knight, 197 Mont. at 173, 642 P.2d at 145 (quoting Batten v. United States, 306 F.2d 580, 587 (10th Cir. 1962) (Murrah, C.J., dissenting)).
¶171 Here, as discussed earlier in this Dissent, the Sportsmen “represent the voices of thousands of Montana men and women who believe 1-143 is vital to the protection of Montana’s wildlife and to the tradition of fair chase hunting.” According to the Sportsmen, “1-143 was designed and enacted to address very serious dangers to Montana’s wildlife and fair chase hunting heritage.” Based on the principle that the State may not force some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole, I would hold that the costs of achieving the Sportsmen’s goals for all Montanans must be borne by the public, not disproportionately placed on the shoulders of the alternative livestock ranchers.
IV. CONCLUSION
¶172 In conclusion, I disagree with the Court’s analysis of the Ranchers’ claims under the Fifth Amendment for the reasons stated in my Kafka dissent. I also disagree with the Court’s analysis of the Ranchers’ claims under Article II, Section 29 for the reasons set forth above.
¶173 As to the latter, I am flabbergasted that this Court, by means of a cramped originalist approach, holds that the rights and protections afforded by the Montana Constitution’s textually distinct and broader eminent domain provision are less protective than those afforded by the federal constitution. This holding not only flies in the face of the plain language of Article II, Section 29, but also flouts this Court’s heretofore dedication to interpret the coordinate, overlapping, and redundant guarantees of the Declaration of Rights together so as to give effect not only to the letter of the constitutional language, but also to the spirit of Montana’s highest law.
*269 ¶174 Though federal jurisprudence may dictate the minimum protections of property rights, Article II, Section 29 constitutes a separate and enforceable constitutional right. Creating a body of law grounded in Article II, Section 29 is necessitated not only by its broader language and its inclusion in the Declaration of Rights, but also by the fact that federal caselaw contains doctrines and precedents that are antithetical to Montanans’ property interests-the most notable of which, in recent memory, is Kelo v. City of New London, 545 U.S. 469, 125 S. Ct. 2655 (2005), a case clearly of concern to Montanans as evidenced by the legislative responses thereto. See Laws of Montana, 2007, Ch. 512 (amending various statutes to provide that private property may not be acquired by eminent domain for the purpose of increasing tax revenue).
¶175 It is said that hard cases make bad law. This case proves the rule. In “carefully crafting” 1-143 to end-run the just-compensation requirement of Article II, Section 29, the Sportsmen sold the Initiative to 204,282 Montana voters in a classic bait and switch: promote one product with the ulterior goal of selling something entirely different. Wrapped in the hyperbole of “ethical fair chase hunting” and protecting Montana’s feral ungulates from disease, hybridization, and privatization, the Sportsmen depicted the alternative livestock ranchers as bad people conducting an offensive business injurious to these higher principles. Yet, the Sportsmen’s intent with 1-143 was not to address the concerns argued to the voters. Rather, it was to drive a subjectively reprehensible industry out of existence by denying the businesses in that industry the ability to charge for their principle service.
¶176 While it is important to acknowledge 1-143 as the patent fraud that it was, this, of course, is not the critical issue here. Likewise, for the State to concede that it promoted and enabled the alternative livestock industry for some 83 years prior to the passage of 1-143, but in the next breath condemn the industry as an offensive and harmful public nuisance in which the Ranchers had no compensable property interests, is hypocrisy of the highest magnitude. Yet, that too is water over the dam. Rather, the point to be made in this case and in Kafka is that if the voters want to vote an “offensive” industry out of existence, so be it. But they need to understand (as they did not here) that there is cost to doing so, and Article II, Section 29 guarantees payment regardless of whether the business owners are perceived as bad people. In other words, the voters must understand that there is fundamental constitutional principle at stake: If the public, throughits *270 government, takes or damages a person’s private property for the public’s use or perceived benefit, then the public, through its taxpayers, must pay just compensation to that person.
¶177 No doubt the Court’s decision here and in Kafka will be hailed as the final nail in the alternative livestock ranchers’ coffin. Unfortunately, while the Court has provided the coup de grace to what a majority of the voters perceived as a noxious and offensive industry, the fallout from these two decisions will not be so limited. This Court has now cabined the scope of Article II, Section 29 beyond its historical underpinnings and its plain language. In so doing, the Court has diminished the right of Montanans under Article II, Section 3 to acquire, possess, and protect property. The Court has also reinforced the government’s inexorable reach into other Montana businesses.
¶178 Worse still, our decisions will encourage other groups to promote and sell similar bait-and-switch initiatives which, if “carefully crafted,” may effectively nullify other fundamental rights. This result is abhorrent. Today, it is the right to be paid just compensation when the State takes or damages private property. But given the Court’s decision to ratify I-143’s blatant attempt to end-run this right, all of the other Article II rights are equally at risk. The result this Court has achieved in this case and in Kafka is not worth the ultimate cost to Montana’s Constitution.
¶179 I dissent.
DISTRICT JUDGE SWANDAL, sitting for JUSTICE MORRIS, joins the Dissent of JUSTICE NELSON.

 The Court prefers the term “game farm.” Opinion, ¶ 3. The statutory scheme, however, uses the term “alternative livestock ranch.” See § 87-4-406(2), MCA. “Game farm” is nowhere mentioned. Accordingly, I use the term “alternative livestock ranch.”

 See also e.g. State v. Bullock, 272 Mont. 361, 373-84, 901 P.2d 61, 69-76 (1995); State v. Scheetz, 286 Mont. 41, 45-51, 950 P.2d 722, 724-28 (1997); State v. Bassett, 1999 MT 109, ¶¶ 22-45, 294 Mont. 327, ¶¶ 22-45, 982 P.2d 410, ¶¶ 22-45; State v. Elison, 2000 MT 288, ¶¶ 45-58, 302 Mont. 228, ¶¶ 45-58, 14 P.3d 456, ¶¶ 45-58; State v. Lovegren, 2002 MT 153, ¶¶ 18-25, 310 Mont. 358, ¶¶ 18-25,51 P.3d 471, ¶¶ 18-25; State v. Tackitt, 2003 MT 81, ¶¶ 17-31, 315 Mont. 59, ¶¶ 17-31, 67 P.3d 295, ¶¶ 17-31.

 The word “verbatim” means “following the original word for word.” Webster’s New World College Dictionary 1587 (4th ed., Wiley 2002). Article III, Section 14 (1889) states: “Private property shall not be taken or damaged for public use without just compensation having been first made to or paid into court for the owner.” Article II, Section 29 (1972) states (with italics representing language not contained in Article III, Section 14): “Private property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court for the owner. In the event of litigation, just compensation shall include necessary expenses of litigation to be awarded by the court when the private property owner prevails.”

 Federal regulatory takings jurisprudence has been described as a “doctrinal muddle” lacking “theoretical coherence,” Bradley C. Karkkainen, The Police Power Revisited: Phantom Incorporation and the Roots of the Takings “Muddle," 90 Minn. L. Rev. 826, 827, 828 (2006), “a confused body of law containing contradictory principles and standards,” John D. Echeverria & Sharon Dennis, The Takings Issue and the Due Process Clause: A Way Out of a Doctrinal Confusion, 17 Vt. L. Rev. 695, 696 (1993), a composite of “ad hoc determinations rather than principled resolutions,” Carol M. Rose, Mahon Reconstructed: Why the Takings Issue is Still a Muddle, 57 S. Cal. L. Rev. 561, 562 (1984), and an area of law whose “predominant characteristic” is “a welter of confusing and apparently incompatible results,” Joseph L. Sax, Takings and the Police Power, 74 Yale L. J. 36 (1964). It has been said that “[e]ven the wisest lawyers would have to acknowledge great uncertainty about the scope of [the Supreme Court’s] takings jurisprudence.” Nollan v. California Coastal Com’n, 483 U.S. 825, 866, 107 S. Ct. 3141, 3164 (1987) (Stevens & Blackmun, JJ., dissenting). The Supreme Court itself has *264 acknowledged that its regulatory takings jurisprudence “cannot be characterized as unified.” Lingle, 544 U.S. at 539, 125 S. Ct. at 2082. See also Kafka Dissent, ¶¶ 148-151 (discussing the conflation of takings and substantive due process principles).